IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | Criminal No.: 9:05-cr-00928 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| Michael A. Singer, | ) | |
|   a/k/a Mickey Singer | ) | ORDER |
| John H. Kang, | ) | |
| John P. Sessions, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion *in limine* to preclude the government from offering certain evidence and arguments related to Medical Manager's stock price movements. The government filed a response in opposition. For the reasons set forth below, defendants' motion is granted.

I. **BACKGROUND**

On February 23, 2009, defendants filed a motion *in limine* asking the court to preclude the government from offering certain evidence and arguments related to Medical Manager's stock price movements and any evidence to prove Counts Two through Seven or the forfeiture allegations of the Second Superseding Indictment. After a hearing on this matter, the court determined that absent expert testimony the government could not prove the causal connection necessary to sustain Count Two. Order at 2, June 16, 2009 (Dkt. 713). Following the court's order, the government

1

dismissed Count Two. The court did not address the effect of its ruling on the evidence the government intended to admit to prove Count One.

Defendants filed the present supplemental motion seeking further relief pursuant to their original motion "to preclude the government from arguing, or offering any evidence purporting to support the argument, that the alleged misstatements by Medical Manager Corporation or WebMD (collectively the "Company") affected the company's stock price at any particular time, including, but not limited to argument or evidence regarding the Company's stock price or sales of Company stock by the Defendants." Def. Mem. at 1. The court held a hearing on this matter on December 17, 2009.

## II. DISCUSSION

In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), the Supreme Court held that it is not sufficient to establish loss causation in a civil securities fraud action by alleging that the purchase price was inflated because of misrepresentations.[1] To prove loss causation, "a causal connection between the material misrepresentation and the loss" must be shown. Id. at 342. According to the Supreme Court, stock purchase prices may reflect "not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."

---

[1] Dura Pharmaceuticals involved a civil securities fraud claim. 544 U.S. 336. The Court considered the link between inflated stock prices and alleged misstatements. Id. Although clearly the government need not prove specific economic loss or loss causation, and defendants do not contend otherwise, the Court's reasoning on the necessary evidentiary link between misstatements and inflated stock price is applicable to this motion.

2

Id. at 343. The Court acknowledged that a misrepresentation may "touch upon" a later economic loss, but concluded that "[t]o 'touch upon' a loss is not to *cause* a loss, and it is the latter the law requires." Id. (emphasis in original). The Court has stated that "the logical link between the inflated share purchase price and any later economic loss is not invariably strong." Id. at 342.

In Unger v. Amedisys Inc., 401 F.3d 316, 324 (5th Cir. 2005), the Fifth Circuit reviewed a grant of class certification and discussed the causal connection between corporate conduct and stock price for a civil securities fraud claim. According to the Fifth Circuit:

> The district court also found a causal connection between Amedisys corporate events and the movement of the stock price, but did not take into account the many other factors that could affect the price of Amedisys stock. The court correctly identified the causal connection as one of the most important market-efficiency factors. It goes to the heart of the "fraud on the market" theory: In an efficient market, where information is nearly perfect, material misstatements alter a stock's price almost immediately. In such circumstances, "it is easy to see how injury can befall a person who is unaware of the deceit." Demonstrating that market reactions are caused by company press releases should not, however, be an exercise in *post hoc, propter hoc* logic. Many variables have the potential to and do affect a stock price–the daily market average; national, local and industry-specific economic news; competitor's activities; and on and on. The overall volatility of the stock price and the speed of its reaction to company news may also be significant. To this end, expert testimony may be helpful because of the utility of statistical event analysis for this inquiry.
>
> Instead of recognizing the complexity of this cause-and-effect factor, the court relied on a showing that [on specific dates], the stock price rose following positive announcements issued by Amedisys on those days, and the price dropped the day the company announced that its earnings would be restated. This evidence is no doubt worthwhile, but standing alone, it is insufficiently probative to determine, based on "empirical facts," that a causal connection exists.

Unger, 401 F.3d at 324-25 (internal citations omitted). The Fifth Circuit vacated the

district court's decision because the district court did not engage in sufficient analysis required for class certification dependent on the fraud-on-the-market theory.

In United States v. Schiff, 538 F. Supp. 2d 818, 835 (D.N.J. 2008), appeal docketed, No. 08-1903 (3d Cir. Mar. 26, 2008), the court recognized that "[a]lthough specific dollar loss causation is not an element of the charged crime, if the Government wishes to use a stock price drop as evidence of materiality, it must demonstrate that the public disclosure of the misstatements charged in the indictment had an 'appreciable negative effect' on the stock price."[2] The court provided the following hypothetical to demonstrate this principle:

> [I]f [the corporation] announced a disclosure related to the charged misstatement on the same day that [the corporation] lost a major patent case, a jury would not be able, without the assistance of an expert, to determine whether the observed drop in [the corporation's] stock price was appreciably affected by the disclosure of charged misstatement or not. If the jury cannot determine such a relationship using common sense, then the stock price is not probative of the materiality of the alleged misstatements absent expert methodology to separate the effects of the two factors and give the jury a basis to draw an inference without speculating. This methodology need not measure the impact to a mathematical certainty, but it must do so sufficiently to determine if there is "an appreciable negative effect" on price by the curative announcement of the misstatement charged in the indictment.

Id. at 835. The court went on to note that "a drop in stock price, by itself, does not establish that the decline was caused by the revelation of an earlier misrepresentation." Id. "Courts often turn to economic experts to determine whether a particular announcement had an appreciable effect on the stock price." Id. According to the

---

[2]The issue in this case differs only in that it involves whether the charged conduct caused an appreciable positive effect in the stock price. There is no logical difference in the causation of a drop or of a rise in stock price when considering the relationship of specific conduct to a change in a stock price.

4

district court, "[t]he reason for the use of expert testimony in this context is clear: the formulas for calculating the reaction of the market to specific disclosures are complicated and <u>not common sense observations that could be left to the jury</u>." <u>Id.</u> (emphasis added).

In considering whether to admit one of the government's experts under the <u>Daubert</u>[3] standard, the <u>Schiff</u> court made the following observation: "Perhaps the day before the <u>Daubert</u> hearing the Government recognized that it made little analytic sense to argue that the Government can admit stock price drop evidence to show materiality without demonstrating a causal link between the price drop and the charged conduct." <u>Id.</u> at 839-40. Following the hearing, the government offered a new theory of admissibility. <u>Id.</u> at 841. However, the court concluded that the government had not provided notice and the factual premises were "too late and with far too little to support a ruling at the 11th hour that permits [the expert] to testify beyond the areas outlined above." <u>Id.</u> at 842.

The next issue considered by the district court was the exclusion of the defendant's expert. <u>Id.</u> The government argued that defendant's expert testimony would be overly prejudicial because if the expert testified that the disclosures did not cause the stock price drop, "there is every reason to believe that the jury may be misled into concluding that no crime was committed . . . ." <u>Id.</u> at 843. The court criticized the government for turning the argument on its head and misunderstanding the relevance of stock price drop evidence. <u>Id.</u> The court went on to say:

> If the Government wishes to argue to the jury that the jury can infer materiality from a stock price drop, the Government implicitly invites the jury to speculate that the cause of the stock price drop is the charged conduct.

---

[3] <u>See</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).

5

> Indeed, that is what Paragraph 46 of the revised Indictment invites the jury to do when it alleges that Defendant Schiff's alleged fraud "caused BMS shareholders to sustain hundreds of millions of dollars in losses after the nature and extent of BMS's channel stuffing and buildup of excess inventory was disclosed to the public beginning on or about April 1, 2002." If anything, such speculation would be overly prejudicial to the defendant without evidence of the causal connection, not the reverse.

Id.

Finally, in a footnote, the court addressed its ruling requiring expert testimony for admission of evidence related to stock price drop. Id. at n.30. The court stated that when presented with the question of the admissibility of stock price drop, it "was concerned that the multiple disclosures in this case made this case substantially different from cases where stock price drop evidence was admitted without expert testimony." Id. Thus, the court ruled that "an expert would be necessary to prevent the jury from improperly speculating about materiality when presented with evidence of a stock price drop that might not be related to Defendant's conduct." Id. The court also noted that it did not require the government or its expert to prove any specific loss to a particular victim. Id.

The government cannot be allowed to attempt to use evidence of a misrepresentation coupled with an increase in stock price, and then request that the jury make "a logical inference" where the Supreme Court, and lower courts, have held that one does not exist. This case involves thirty-five acquisition deals and a multi-year conspiracy. By contrast, the court in Schiff was concerned about the causal connection between only a handful of disclosures and allegedly attendant stock price drops. See Schiff, 538 F. Supp. 2d at 836. Here, without an event analysis and expert testimony, it would be impossible, without unsupported speculation, for the jury to conclude that

defendants' allegedly fraudulent conduct caused a rise in the stock price.

The government argues that "expert testimony is simply not needed to show that a company's stock value increased during a given period of time." Govt. Resp. at 7-8. While this proposition may be true, the issue is that the government claims "it should be free to argue logical inferences based upon evidence to the jury, which is, notwithstanding what actually caused the stock price to increase, the defendants engaged in fraud to make the stock value increase, which it did, and they, as a result, intended to unlawfully enrich themselves when they sold their stock." Id. at 7. This reasoning is flawed. Absent any evidence of a causal connection, which can only be established by an expert, the government cannot link the stock price rise with the allegedly fraudulent conduct. The courts have been clear that many factors contribute to the purchase price of stock on any given day. In order for defendants to dispute the "logical inference" the government wishes to argue to the jury, defendants would be required to prove a negative through an expert witness who had conducted an event analysis.

There is absolutely no evidence of a causal link, nor has the government attempted to establish one, between defendants' alleged multi-year, multi-acquisition conspiracy, and the rise in stock price. To allow the government to argue to the jury that over the course of several years the stock price rose as a result of the thirty-five allegedly fraudulent acquisitions rather than as a result of other factors such as the mergers, the economic boom of the late nineties, the strength of the product, the many other acquisitions, or innumerable other factors, is simply not a permissible inference absent expert evidence to support the government's argument.

7

In United States v. Ferguson, 2007 WL 4556625, * 3 (D. Conn. Dec. 20, 2007), the unpublished decision relied on by the government, the court concluded that "the government's witnesses may provide their opinions as to whether information about AIG's loss reserves was significant to investors, provided that the government lays a proper foundation that the witnesses formed these opinions based upon personal knowledge." The court determined the analyst's testimony as to whether loss reserves were important to investors "will help the jury address materiality–that is, whether the information would have been of significant importance to a reasonable investor." Id. However, "[t]he Court agrees with [defendant] that expert testimony may be necessary to establish the effect, if any, of AIG's loss reserves on its stock price." Id. at n. 5.

In this case, applying the reasoning of the Ferguson court, the government still would not be able "to establish the effect, if any, of [Medical Manager's false revenue recognition] on its stock price" without expert testimony. Id. In other words, the government may not attempt to show the actual effect that the alleged fraud had on the price of Medical Manager stock without expert testimony.

Defendants do not dispute that the government may present evidence related to defendants' motive and their intent to raise the price per share of Medical Manager stock. However, the historical rise in stock price is not evidence of such intent or motive because it cannot be attributed to the alleged conduct for which motive and intent are probative. A rise in stock price is not *ipso facto* indicative of a conspiracy to inflate the stock price. In its response, the government argues that "[t]o argue that the defendants derived economic benefit as a result of their fraud, the United States is not limited, by the

Rules of Evidence or by previous orders of this Court, to expert testimony on the precise dollar amount Medical Manager's stock value increased." Govt. Resp. at 4. The issue is not whether the government argues that the intent was to inflate stock price and receive an economic benefit; the problem is in putting forth evidence to show intent, and putting forth evidence of an actual rise in stock price, and then arguing to the jury that they are causally related, all without any expert testimony to substantiate that connection. As noted by the Schiff court, these are "not common sense observations that could be left to the jury." Shiff, 538 F. Supp. 2d at 835.

Because the government does not have expert testimony that establishes the logical link the government wishes the jury to infer, the government is precluded from arguing or offering evidence of the stock price at any given time or that the alleged misstatements in fact affected the Medical Manager stock price.

### III. CONCLUSION

For the reasons set forth above, defendants' motion to exclude evidence or argument related to Medical Manager's stock price movement is **GRANTED**.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**January 8, 2010**
**Charleston, South Carolina**

9